[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 19, 2009
THOMAS K. KAHN
CLERK

No. 09-10312
Non-Argument Calendar

_____

D. C. Docket No. 08-00110-CR-ORL-31-DAB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOEY ROJAS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 19, 2009)

Before BLACK, BARKETT and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Defendant Joey Rojas appeals his conviction for marriage

fraud in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. § 2.  After review, we affirm.

## I.  BACKGROUND

Because Defendant Rojas challenges the sufficiency of the government's evidence, we review the government's evidence presented at trial through witnesses Mercedes Aspitia, Ender Rodriguez, and Agent Tracy McCormick.

In December 2000, Mercedes Aspitia, a citizen of Argentina, traveled to the United States on a tourist visa with Edgar Jayo, her husband, their son, and other family members. Aspitia's tourist visa allowed her to stay in the country for ninety days.  Aspitia, Jayo, and their son remained in the United States after their tourist visas expired.

At her brother's wedding several years later, Aspitia met Ender Rodriguez. Aspitia later learned that Rodriguez arranged sham marriages between aliens and American citizens to circumvent the immigration laws.  In fact, Rodriguez had arranged approximately 200 sham marriages over the previous five years.  Aspitia contacted Rodriguez by phone to arrange a marriage that would allow her to stay in the United States.  Rodriguez agreed, telling her that the marriage would cost $8,000; she would pay the citizen spouse $4,500, and Rodriguez would charge $3,500 as his fee.

2

In January 2004, Aspitia and Jayo divorced so that each could enter into a sham marriage that would allow them to remain in the United States. Notwithstanding their divorce, Aspitia and Jayo continued to live together, even after Jayo married Myrna Ramos. Aspitia could not afford her own marriage until a year later.

During this time, one of Rodriguez's clients introduced Rodriguez to Defendant Rojas. Rodriguez offered to pay Defendant Rojas a total of $8,000 to marry a nonresident alien, $4,000 at the time of the marriage, and $4,000 after "the second interview with Immigration." Defendant Rojas agreed, and Rodriguez introduced Rojas to Aspitia.

Rodriguez brought Defendant Rojas to Aspitia's home, where Jayo and their son were staying. Rodriguez walked Defendant Rojas and Aspitia through the immigration process, described questions they could expect the immigration officer to ask at the interview, and requested documents so that he could prepare the necessary immigration forms. Aspitia next saw Defendant Rojas on the day they obtained the marriage license, at which time she paid Rojas $4,500. She also met Rojas' family in preparation for the immigration interview. Finally, in January 2005, Aspitia and Defendant Rojas were married in a small civil ceremony. They took pictures to document the wedding. Aspitia continued to live with Jayo and

their son, even though several documents falsely indicated that she lived with Defendant Rojas. The only night Defendant Rojas spent at Aspitia's home was the night before their immigration interview.

As promised, Rodriguez prepared the immigration forms and met with Defendant Rojas and Aspitia one week before the immigration interview to prepare them. Under Rodriguez's guidance, Aspitia applied with the United States Citizenship and Immigration Services ("USCIS") for a green card based on her marriage to Defendant Rojas. As part of her application, signed March 14, 2005, Aspitia submitted a Form I-485, an Application to Register Permanent Residence or Adjust Status, which is a sworn document signed by the alien spouse seeking to obtain permanent residence in the United States. Defendant Rojas submitted the corresponding Form I-130, signed February 26, 2005, which the citizen spouse submits to help the alien spouse obtain permanent residence. Rojas also signed a Form I-864, an Affidavit of Support, on March 14, 2005, in which he represented that Aspitia would not "become a public charge on the government." Additionally, Aspitia provided a second Affidavit of Support from Rudys Gomez.[1]

In support of her application for permanent residence, Aspitia and Defendant Rojas underwent a sworn interview with Agent Tracy McCormick of the USCIS.

---

[1]While it is not rare for an applicant to provide two sources of support, Agent McCormick testified that the USCIS considers it one of many indicators of a sham marriage.

Rojas told McCormick that he met Aspitia on the bus they rode to their respective places of work. Agent McCormick observed that the same bus route did not service both Defendant Rojas's and Aspitia's places of employment, at which point Rojas became confused. At the interview, McCormick noted that Rojas and Aspitia "appeared very cold to each other, [made] little eye contact, [and there was] very little interaction between the two of them." Also, Rojas had difficulty answering basic questions concerning Aspitia's birthday, the spelling of her last name, or from where she came. McCormick also asked about Jayo, to which Aspitia responded that she did not know his whereabouts, even though USCIS records indicated that Jayo was using the same address that Rojas and Aspitia provided in the interview. McCormick concluded that the marriage was a sham.

Defendant Rojas testified on his own behalf. Rojas stated that he had met Aspitia about four times while riding the bus, and she had invited him to her home for a cookout. Rojas claimed that he planned to stay on her couch, but she invited him to her bed in the middle of the night. Rojas asserted that, after initially declining her invitation, he went to her bed where they had sexual intercourse. According to Rojas, the sexual relationship continued for about two weeks, at which point Aspitia demanded that Rojas marry her if he wanted to keep seeing her. Rojas claimed that he married her for love, not money. Rojas testified that he

5

did not know about Aspitia's immigration status until 2006, sixteen to eighteen months after the marriage. He denied ever meeting Rodriguez.

Rojas did not move for judgment of acquittal either after presentation of the government's evidence or at the close of his case. The jury found Rojas guilty.

## II. DISCUSSION

Defendant Rojas argues on appeal that the government presented insufficient evidence at trial to sustain his conviction. To convict a defendant of marriage fraud under 8 U.S.C. § 1325(c), the government must prove beyond a reasonable doubt that (1) the defendant knowingly entered into a marriage and (2) the defendant entered into the marriage for the purpose of evading any immigration laws.[2] As noted, Rojas failed to move for judgment of acquittal at the close of evidence. While this Court ordinarily reviews de novo the sufficiency of evidence to support a conviction, in the absence of a motion for judgment of acquittal, this Court will reverse a conviction only to prevent a "manifest miscarriage of justice." United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002). This standard

---

[2]This Court has not addressed whether the government also must prove that the defendant entered the marriage with knowledge that the conduct was unlawful. There is a split in the circuits over whether the government must prove this third element. See, e.g., United States v. Chowdhury, 169 F.3d 402, 407 (6th Cir. 1999); United States v. Islam, 418 F.3d 1125, 1128 (10th Cir. 2005). But see United States v. Rashwan, 328 F.3d 160, 164 (4th Cir. 2003). Because the government's evidence would have satisfied this element as well, we need not, and do not, decide whether the government must prove that the defendant entered into the marriage with the knowledge that the conduct was unlawful in order to prove a marriage fraud conviction under 8 U.S.C. § 1325(c).

6

requires us "to find that the evidence on a key element of the offense is so tenuous that a conviction would be shocking." Id.

Defendant Rojas cannot meet his burden of showing that the evidence on a key element of the crime is so tenuous that his conviction is shocking. Rojas does not dispute that the first element of 8 U.S.C. § 1325(c), knowingly entering into a marriage, is satisfied here. Although Rojas claims that the government has failed to prove the second element, entering into the marriage for the purpose of evading any immigration law, we disagree because the government presented ample evidence that would allow a jury to conclude that this element is satisfied. Rodriguez and Aspitia both testified that, in exchange for money, Defendant Rojas agreed to marry Aspitia to help her obtain permanent residence status. Further, Rojas signed the immigration forms in February and March of 2005 — less than two months after the marriage, and more than a year before he claimed to have become aware of Aspitia's immigration status. Additionally, Rojas's performance at the immigration interview strongly indicates that he barely knew Aspitia and that the story of their meeting was a fabrication.

Although Defendant Rojas's testimony contradicted Rodriguez and Aspitia, the jury, as the finder of fact, was free to disbelieve him. United States v. Deverso, 518 F.3d 1250, 1258 (11th Cir. 2008). In fact, the jury was entitled not only to

7

disbelieve Rojas, but to find that his demeanor and credibility suggested the opposite of what he testified. Id. The jury may treat a defendant's false explanations "as substantive evidence of the defendant's guilt." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (emphasis in original).

We cannot say that Defendant Rojas's testimony, which the jury was entitled to interpret to his detriment, along with the evidence the government provided, are so tenuous as to be shocking. Accordingly, because Rojas has not met his burden on appeal, we will not disturb his conviction.

**AFFIRMED.**